UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,           16 cr. 826 (LTS)

    - against -

JAIME GONZALEZ

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## SENTENCING MEMORANDUM

MARLON G. KIRTON, ESQ.
Attorney for Defendant
JAIME GONZALEZ
175 Fulton Avenue, Suite 305
Hempstead, New York 11550
(516) 833-5617 ph

1

# KIRTON LAW FIRM

*Marlon G. Kirton, Esq.*

_____

*Nassau County:*
*175 Fulton Avenue, Suite 305*
*Hempstead, New York 11550*
*Tel. # (516) 833-5617*
*Fax # (516) 833-5620*

May 1, 2020

VIA ELECTRONIC FILING

Honorable Paul A. Engelmayer
United States District Judge
Thurgood Marshall
United States Courthouse
Southern District of New York
40 Foley Square
New York, NY 10007

Re: *United States v. Jaime Gonzalez, 18 cr. 179 (PAE)*

Dear Judge Englemayer:

      Governor Cuomo ordered all New York City subways to cease operations between 1:00 am, and 5:00 am.[1] The Governor wants the trains cleaned for use by essential workers during New York State's "Shelter at Home" initiative.[2] The Governor was concerned about homeless people sleeping on the trains all night and possibly infecting essential workers riding to and from work.[3] The homeless will be forbidden from entering the trains and train stations, during these hours. Jaime Gonzalez is homeless. I am sure he does not know the Governor. However, Jaime is entering a world that is uncertain at best.

      Jaime and I were born in the same year. However, our lives took different paths. Jaime's parents were never married. Jaime's family grew up in poverty and had to rely on public assistance. Jaime never finished high school. Jaime started experimenting with drugs at an early age and became addicted to heroin. Jaime sold drugs and committed other crimes to support his expensive habit. Jaime spent most of his life in and out of jail. He also spent time in and out of drug rehabilitation. Jaime has been homeless for more than a decade. He has slept in parks, stairwells, subway trains, and anywhere he could lay his head.

---

[1] https://www.newsday.com/news/health/coronavirus/coronavirus-long-island-new-york-1.44279998
[2] *Id.*
[3] *Id.*

2

Jaime suffers from depression and has had suicidal thoughts. His drug use and mental health issues have dogged him for most of his adult life. It has created a cycle of poverty, homelessness, addiction, hopelessness, and criminality. He was not able to raise his son. He was never able to support his mother financially. He was never able to support his son or daughter-in-law financially. He has never had a sustainable career. Jaime's life is dependent on the goodwill of others. He spent many a night sleeping in the hallway of a friend. His social security number and birth certificate do not match. Therefore, Jaime has not been eligible for social service benefits for most of his adult life. His primary communication outside of MCC is with his son. He does not keep in touch with his larger family.

Jaime's best hope is to enter and complete an in-patient drug and mental health rehabilitation program. A program will allow him to develop the tools needed to navigate his addiction. The program could help resolve his birth certificate situation. Finally, the program could help him get the housing and the benefits that he needs to become an essential worker, not an undomiciled individual.

## SENTENCING FACTORS

The United States Supreme Court in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), focused on sentencing factors that impact the defendant. *Apprendi* requires that "any fact that increases the penalty for a crime beyond the statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." 530 U.S. at 490. The Supreme Court extended the logic of *Apprendi* in the landmark *Blakely* case. *Blakely v. Washington*, 124 S. Ct. 2531 (2004). The Court reviewed the constitutionality of a Washington State statute like the United States Sentencing Guidelines (U.S.S.G.). In *Blakely*, the trial court sentenced the defendant to more than three (3) years above the 53-month statutory maximum for his offense. The basis of the enhanced sentence was based on a finding made solely by a judge without the input of the jury. *Blakely* held that the Washington State sentencing guidelines violated the defendant's Sixth Amendment right to a jury trial. The Court reasoned that the statutory maximum is any fact found by a jury or admitted by a defendant. However, *Blakely* did not expressly apply to the U.S.S.G. *Blakely, supra* at footnote 9.

The Supreme Court then applied its Sixth Amendment analysis to the U.S.S.G. *United States v. Booker*, 125 S. Ct. 738 (2005). In *Booker*, (also included in the companion case of *United States v. FanFan*), the Court applied the reasoning and holding of *Blakely* to the U.S.S.G. The Supreme Court held that a statutory maximum for purposes of the Sixth Amendment was any fact proved by a jury or admitted by a defendant. The Court reasoned that for the U.S.S.G. to be constitutional, they had to be advisory rather than mandatory. 18 U.S.C. 3553(b) directs that the court "shall impose a sentence of the kind and in the range" established by the Guidelines. *Booker, supra.* To the extent that this section of the statute was mandatory, the Court severed section 3553(b) and made the U.S.S.G. advisory rather than mandatory on federal judges. Furthermore, the Court also severed 18 U.S.C. 3742(e) as unconstitutional and held that the standard of review for appellate courts reviewing sentencing issues is "reasonableness." *Booker*,

*supra*. Finally, Courts of Appeal were no longer entitled to review downward departures de novo, the standard for review is reasonableness. *Booker, supra.*

The Second Circuit's first attempt at applying *Booker* came in *Crosby*. *United States v. Crosby*, 397 F.3d 103 (2nd Cir. 2005). In that case, the defendant pleaded guilty and was sentenced to ten (10) years. He appealed, and the court had to decide whether his sentence was unreasonable, considering the *Booker* decision. The court remanded the case for the district court to apply the new standards in *Booker,* but it gave guidance to that court as well as all district courts. It held that a district court must consider the U.S.S.G. when rendering a judgment. While acknowledging that the U.S.S.G. had become primarily advisory, the court cautioned against returning to a pre-guidelines world of marked sentencing disparities. The Circuit gave a checklist for district courts to apply when implementing *Booker*, 1. The U.S.S.G. is no longer mandatory, 2. The district court must consider the U.S.S.G. as well as the other factors in section 3553(a), 3. The application of the U.S.S.G. will usually require determination of the applicable range for a particular case, 4. The district court, after considering the U.S.S.G. and all of the relevant factors in section 3553(a), must decide whether to impose a guidelines sentence or a non-guidelines sentence and 5. The district court is entitled to find all of the facts appropriate for rendering either a guidelines or a non-guidelines sentence

## APPLICABLE GUIDELINES RANGE

Given the guidance of *Crosby*, it is necessary to determine the appropriate guidelines range for Jaime. Jaime is charged with conspiracy to distribute and possess with intent to distribute heroin in violation of 21 U.S.C. 846 and 841 (b)(1)(C). The charge carries a maximum of twenty years in prison, a fine of up to $1,000,000, a mandatory minimum of 3 years supervised release a maximum of life, and a $100 special assessment. His base offense level is 28, pursuant to U.S.S.G 2D1.1(a)(5) and (c)(6). A 2-level increase is warranted because a firearm was possessed, pursuant to U.S.S.G 2D1.1(b)(1). He receives a 3-level reduction for acceptance of responsibility pursuant to U.S.S.G. 3E1.1(a) (b). His adjusted base offense level is 27. He has eleven (11) Criminal History Point; therefore, he is a Criminal History V. Therefore, his guidelines range is 120-150 months. Jaime does not have a mandatory minimum because he pleaded guilty to a lesser included offense. The Probation Department recommended a below guidelines sentence of 60 months.[4]

## COVID-19

As of April 29, 2020, the new strain of coronavirus, which causes COVID-19, has infected over 1.3 million people, leading to at least 81,106 deaths in the United States.[5] On March 11, 2020, the World Health Organization officially classified COVID-19 as a pandemic.[6]

---

[4] *Final PSR, page 28.*
[5] *Coronavirus Map: Tracking the Spread of the Outbreak*, The New York Times (April 7, 2020), *at* https://nyti.ms/2U4kmud (updating regularly).
[6] *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (March 11, 2020) *at* https://bit.ly/2W8dwpS.

4

Governor Andrew Cuomo declared a State of Emergency on March 7, 2020.[7]  Mayor Bill de Blasio declared a State of Emergency in New York City on March 12. 2020, and banned gatherings of over 500 people.[8]  As of April 29, 2020, there were 299,691 positive cases (18,015 deaths) in New York State[9]; and as of April 29, 2020, there were 159,865 positive cases (12,774 deaths) in New York City.[10]

The CDC has issued guidance that individuals at higher risk of contracting COVID-19—adults over 60 years old and people with chronic medical conditions such as lung disease, heart disease, and diabetes—take immediate preventative actions, including avoiding crowded areas and staying home as much as possible.[11]

Persons who have abused heroin over a long period tend to have weakened immune systems.[12] Persons that have weakened immune systems are at an elevated risk of infection from COVID-19.[13] Jaime used heroin for more than half of his life. Therefore, he is at an elevated risk of COVID-19 infection because of his weakened immune system.

## CONDITIONS OF CONFINEMENT IN GENERAL

Conditions of pretrial confinement create the ideal environment for the transmission of contagious disease.[14]  Inmates cycle in and out of the Bureau of Prisons (BOP) pretrial facilities from all over the world and the country and people who work in the facilities leave and return daily, without screening.  Incarcerated people have poorer health than the general population, and even at the best of times, medical care is limited in federal pretrial detention centers.[15] Many people who are incarcerated also have chronic conditions, like diabetes or HIV, which makes them vulnerable to severe forms of COVID-19.  According to public health experts,

---

[7] *At Novel Coronavirus Briefing, Governor Cuomo Declares State of Emergency to Contain Spread of Virus*, New York State (March 11, 2020) *at* https://on.ny.gov/2TKzIoz.

[8] *DeBlasio Declares State of Emergency in NYC and Large Gatherings Are Banned*, New York Times (March 12, 2020)

[9] *Novel Coronavirus (COVID-19),* New York State Department of Health (April 7, 2020) *at* https://on.ny.gov/2vfFQvy (updating regularly).

[10] *Coronavirus*, New York City Health (April 7, 2020) *at* https://on.nyc.gov/39ME7wU (updating regularly).

[11] *People at Risk for Serious Illness from COVID-19*, CDC (March 12, 2020) *at* https://bit.ly/2vgUt1P.

[12] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC153143/

[13] https://www.cdc.gov/coronavirus/2019-ncov/faq.html#Higher-Risk

[14] Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, *at* https://doi.org/10.1086/521910.

[15] Laura M. Maruschak et al. (2015). *Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12. NCJ 248491*. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, *at* https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf

incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[16]  Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[17]  In China, officials have confirmed the coronavirus was spreading at a rapid pace in Chinese prisons, counting 500 cases.[18]  Secretary of State Mike Pompeo has called for Iran to release Americans detained there because of the "deeply troubling" "[r]eports that COVID-19 has spread to Iranian prisons," noting that "[t]heir detention amid increasingly deteriorating conditions defies basic human decency."[19]  Courts across Iran have granted 54,000 inmates furlough as part of the measures to contain coronavirus across the country.[20]  Brooklyn District Attorney Eric Gonzalez, joined by public health experts, has asked Governor Cuomo to grant emergency clemencies to elderly and sick prisoners.[21]  The BOP reports, as of April 30, 2020, that 1692 inmates and 349 staff have been infected with COVID-19.[22]  COVID-19 has killed 33 inmates.[23]

CONDITIONS OF CONFINEMENT AT MCC

Jaime is incarcerated at the MCC. As of April 30, 2020, there are 5 inmates and 40 staff infected with COVID-19.[24]  MCC is unable to enforce social distancing. The inmates do not have gloves and have no access to hand sanitizer. The inmates use shared showers. Jaime is at an elevated risk of becoming infected by COVID-19 because he is incarcerated at MCC. His exposure to a deadly disease is a factor the court may consider pursuant to 18 USC 3553 (a).

---

[16] *"Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States,"* (March 2, 2020), *at* https://bit.ly/2W9V6oS.

[17] *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020) *at* https://bit.ly/2TNcNZY.

[18] Rhea Mahbubani, *Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials*, Business Insider (Feb. 21, 2020) *at* https://bit.ly/2vSzSRT.

[19] Jennifer Hansler and Kylie Atwood, *Pompeo calls for humanitarian release of wrongfully detained Americans in Iran amid coronavirus outbreak*, CNN (Mar. 10, 2020) *at* https://cnn.it/2W4OpV7.

[20] Claudia Lauer and Colleen Long, *US Prisons, Jails On Alert for Spread of Coronavirus*, The Associated Press (Mar. 7, 2020) *at* https://apnews.com/af98b0a38aaabedbcb059092db356697.

[21] *Coronavirus: Sentenced to COVID-19*, The Daily Appeal (Mar. 12, 2020) at https://theappeal.com

[22] https://www.bop.gov/coronavirus/

[23] https://www.bop.gov/coronavirus/

[24] https://www.nyed.uscourts.gov/pub/bop/MDC_MCC_20200430_053520.pdf

6

## ROLE IN THE OFFENSE

Jaime pleaded guilty to a narcotics conspiracy. In terms of relative culpability, he is lower than the midlevel offenders but greater than the lowest member of the conspiracy.[25] The lowest level member (Mr. Russell) was responsible for between 20-40 grams of heroin.[26] The mid-level member (Mr. Osorio-Perez) was responsible for between 3-10 kilograms of heroin.[27] Mr. Russell received a sentence of time served.[28] Mr. Osorio-Perez received a sentence of 72 months.[29] A sentence of 60 months is appropriate given Jaime's relative culpability in the conspiracy.

## AVOID UNWARRANTED SENTENCING DISPARITIES

All of Jaime's co-defendants have been convicted. Twelve pleaded guilty, and one was convicted after trial. Jason Polanco was convicted after trial. The Court sentenced Rene Ruiz to 156 months in prison.[30] He pleaded guilty to count one of the indictment.[31] His guidelines range was 240 months.[32] The Court sentenced Wilfredo Gonzalez to 156 months in prison.[33] He pleaded guilty to count one of the indictment.[34] His guidelines range was 240 months.[35] The Court sentenced Domingo Ramos to 120 months in prison.[36] He pleaded guilty to count one of the indictment.[37] His guidelines range was 188-235 months.[38] The Court sentenced Amar Ahmed to 87 months in prison.[39] He pleaded guilty to counts eight and eleven of the indictment.[40] His guidelines range was 93-101 months.[41] Zaie Escribano was sentenced to 84 months in prison.[42] He pleaded guilty to count eleven of the indictment.[43] His guidelines range was 84 months.[44] Carlos-Osorio Perez was sentenced to 72 months in prison.[45] He pleaded guilty to count two of the indictment.[46] His guidelines range was 135-168 months.[47] The Court sentenced Dennis

---

[25] *Final PSR, page 10.*
[26] *Final PSR, page 10.*
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] *Final PSR, page 7.*
[31] *Id.*
[32] *Government's Sentencing Memo, page 2.*
[33] *Final PSR, page 7.*
[34] *Id.*
[35] *Government's Sentencing Memo, page 2.*
[36] Final PSR, page 7.
[37] Id.
[38] *Government's Sentencing Memo, page 2.*
[39] Final PSR, page 7.
[40] Id.
[41] Government's Sentencing Memo, page 3.
[42] *Final PSR, page 7.*
[43] Id.
[44] *Government's Sentencing Memo, page 2.*
[45] *Final PSR, page 8.*
[46] *Id.*
[47] *Government's Sentencing Memo, page 2.*

7

Pomales to 120 months in prison.[48] He pleaded guilty to count two of the indictment.[49] His guidelines range was 188-235 months.[50] The Court sentenced Jordan McDonald to 24 months in prison.[51] He pleaded guilty to counts one and two of the indictment.[52] His guidelines range was 92-115.[53] The Court sentenced Edward Nelson to 96 months in prison.[54] He pleaded guilty to count two in the indictment.[55] His guidelines range was 151-188 months.[56] The Court sentenced Christopher Correa to time served. He pleaded guilty to counts one through six.[57] His statutory maximum was life.  The Court sentenced Mark Fernandez to 70 months in prison.[58] He pleaded guilty to count two in the indictment.[59] His guidelines range was 70-87 months.[60] The Court sentenced William Russell to time served.[61] He pleaded guilty to count two of the indictment.[62] His guidelines range was 18-24.[63]

All the defendants received a sentence either at or below the stipulated guidelines range. Ten of the defendants received a sentence below the guidelines range.

In the case at bar, the defendant's guidelines range is 120-150 months.[64] The Probation Department recommended a sentence below the guidelines.[65] A guidelines sentence is inconsistent with most of the sentences rendered in this case. The defense argues that a sentence below the guidelines is appropriate to avoid unwarranted sentencing disparities.[66]

## JAIL TIME CREDIT CALCULATION

A court shall adjust a sentence to include any portion of imprisonment already served on an undischarged term of imprisonment.[67] The court must first determine that the prior sentence is relevant conduct with the instant offense.[68] The court must also determine that the BOP will not credit the client for the time served by the defendant in the prior case.[69] Furthermore, if the prior sentence is already discharged, the court may downwardly depart so long as the defendant would

---

[48] *Final PSR, page 8.*
[49] *US PACER entry #272.*
[50] *Government's Sentencing Memo, page 2.*
[51] *Final PSR, page 8.*
[52] *Id.*
[53] *Government's Sentencing memo, page 2.*
[54] *Final PSR, page 8.*
[55] *Id.*
[56] *Government's Sentencing Memo, page 2.*
[57] *US PACER entry # 447.*
[58] *Final PSR, page 9.*
[59] *Id.*
[60] *Government's Sentencing Memo, page 2.*
[61] *Final PSR, page 9.*
[62] *Final PSR, page 9.*
[63] *Government's Sentencing Memo, page 2.*
[64] Final PSR, page 24.
[65] *Probation recommended a 60-month sentence.*
[66] *18 U.S.C. 3553 (a)(6).*
[67] *U.S.S.G. 5G1.3(b)(1).*
[68] *Id.*
[69] *Id.*

8

have qualified under U.S.S.G. 5G1.3 (b).[70] A sentencing court can take into account the same issues pursuant to 18 USC 3553 a.

In the case at bar, Jaime was writted into the Southern District of New York on February 13, 2017.[71] As of today, he has approximately 38 months of jail time credit. Jaime was convicted of an offense in New York State on April 23, 2015.[72] He was discharged from his state court offense on May 31, 2019.[73] The defense requests that any sentence rendered by this Court take into account the 22 months Jaime served in state court before his appearance in the Southern District of New York. His state court case is relevant conduct pursuant to U.S.S.G. 1B1.3.

## CONCLUSION

The defense requests a non-guidelines sentence of 60 months to be followed by a period of in-patient drug and mental health treatment and 3 years of supervised release. The defense requests that the Court credit Jaime with the 22 months he spent in New York State court. Therefore, the final sentence should be 38 months.

Sincerely,


s/Marlon G. Kirton
Marlon G. Kirton, Esq.



cc: Jordan Estes, Assistant United States Attorney (via electronic mail).
    Amanda Houle, Assistant United States Attorney (via electronic mail).

---

[70] *U.S.S.G. 5G1.3, Application Note 5. U.S.S.G. 5K2.23.*
[71] *Final PSR, page 1.*
[72] *Id, page 17.*
[73] *Id, page 18.*

9